Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS the Opinion and Award of the Deputy Commissioner with some modification as follows:
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. This case is subject to the North Carolina Worker's Compensation Act.
4. An employment relationship existed between plaintiff and defendant-employer Martin Brothers Grading, and N.C. Farm Bureau was the third-party administrator on the risk on the alleged dates of injury: November 29, 1996 and April 2, 1997.
5. The average weekly wage of plaintiff, based on a Form 22, was $362.51, which yields a compensation rate of $241.69 per week.
6. Plaintiff was paid 13 2/7 weeks of temporary total disability benefits from November 30, 1996, through March 2, 1997.
7. On March 3, 1997, plaintiff returned to work earning the same wages he had earned prior to November 29, 1996, and worked until April 2, 1997.
8. Documents stipulated into evidence include the following:
 a. Stipulated Exhibit #1: Plaintiff's medical records and reports of various health care providers;
b. Stipulated Exhibit #2: Industrial Commission forms;
c. Stipulated Exhibit #3: Plaintiff's recorded statement; and
 d. Stipulated Exhibit #4: Discovery and plaintiff's responses thereto.
 EVIDENTIARY RULING
The Full Commission VACATES the Order by Deputy Commissioner Stanback dated August 21, 2000 striking the deposition of Dr. Jonathan Burdette from the record. Defendants filed a Form 33 Request for Hearing appealing Deputy Commissioner Stanback's Order on September 5, 2000 and subsequently requested that the appeal be consolidated with defendants' appeal of the Opinion and Award filed on January 9, 2001. Defendants conducted Dr. Burdette's deposition following the Order as an offer of proof, and plaintiff does not object to the inclusion of Dr. Burdette's deposition into the record in this matter.
 ***********
The Full Commission adopts the finding of fact of the Deputy Commissioner, with some modification, and finds as follows
 FINDINGS OF FACT
1. Plaintiff was born on September 17, 1939. He graduated from high school and thereafter worked as an auto mechanic, in a sausage plant, and doing auto body repair, until he went to work for Lowe's Building Supply, where he worked for 20 years. After working for Lowe's, plaintiff worked as a ham salesman where he earned approximately $31,000.00 per year. Plaintiff was laid off from the ham company and immediately thereafter, plaintiff went to work for defendant-employer, his son Ricky Martin, in August of 1996.
2. Plaintiff was hired by defendant-employer to run a compactor. Plaintiff had at least three years of experience running heavy equipment, including both a large and small compactor. Prior to November of 1996, plaintiff had not had any accidents while working for defendant-employer.
3. Prior to November 29, 1996, the date of one of plaintiff's alleged injuries, plaintiff was an outgoing, intelligent individual. He could play the mandolin, guitar, banjo, and piano. Prior to November 29, 1996, plaintiff loved to spend time with his grandchildren and to draw trucks, cars, heavy equipment, and animals for his grandchildren; and to work in his shop on automotive and mechanical projects. Also prior to November 29, 1996, he and his wife had a healthy and normal sex life.
4. The only medical evidence in the record prior to November 29, 1996, begins on June 28, 1996, when plaintiff received medical treatment for chest pain. The Emergency Room physicians ruled out a heart attack, but noted that plaintiff had a mildly elevated blood sugar count, and mild hypertension. Plaintiff was instructed to follow up with his family physician, Dr. Sharma.
5. On July 1, 1996, plaintiff saw Dr. Sharma, who treated him for non-insulin dependent diabetes, high blood pressure, and depression. Plaintiff's brother had recently died of a sudden heart attack. Dr. Sharma prescribed a controlled diet and medication. The medical records prior to November 29, 1996 show no evidence of any neurological, cognitive, or memory problems.
6. Defendant-employer is a grading company, which "clears" land by removing trees and "grades" the land prior to new construction. On November 29, 1996, while cutting trees to clear the property for a softball field, plaintiff sustained a compensable injury by accident in the course of his employment with defendant-employer when he was struck on the head by a falling tree limb. The force of the blow knocked plaintiff unconscious. There were no witnesses, and no one knows how long plaintiff lay unconscious, hemorrhaging from a large "flap type" laceration which exposed his skull. Plaintiff was found wandering in the woods by another employee and brought to defendant-employer, plaintiff's son. Plaintiff's son took him to the hospital where the triage staff was unable to control the scalp hemorrhage. Plaintiff underwent emergency surgery by a plastic surgeon, who closed the large scalp laceration and repaired multiple left ear lacerations.
7. A CT scan revealed that plaintiff had also suffered a subdural hematoma to the right hemisphere of his brain. After recovering from his surgery, plaintiff was hospitalized for observation of the hematoma. On December 1, 1996, plaintiff was released from the hospital with a diagnosis of right subdural hematoma with left scalp laceration.
8. After returning home from the hospital, both plaintiff and his wife noticed that plaintiff was having problems remembering things. Plaintiff also experienced irritability, anxiety, and began repeating himself. On January 8, 1997, plaintiff scheduled an appointment with Dr. Kimberly Livingston, the neurosurgeon who treated plaintiff in the hospital. After examining plaintiff, Dr. Livingston wrote a letter to plaintiff's family physician, Dr. Sharma, indicating that plaintiff's symptoms were fairly consistent with a closed head injury and that this sort of post-concussive syndrome could continue for an additional six to nine weeks.
9. On February 10, 1997, plaintiff returned to Dr. Sharma for treatment of his diabetes, blood pressure, and complaints of anxiety and insomnia.
10. Dr. Livingston released plaintiff to return to work effective March 3, 1997. Neither plaintiff nor defendant-employer felt plaintiff was capable of returning to work, so defendant-employer gave plaintiff the lightest duty work available, driving a small earth compactor. Plaintiff attempted this job in order to comply with his return to work orders.
11. On April 2, 1997, while operating the small earth compactor, plaintiff sustained another injury by accident within the course of his employment with defendant-employer when he backed the compactor onto a steep grade, overturning the compactor and suffering another head injury. Plaintiff had three years of experience driving a compactor prior to this accident. Plaintiff had never turned over a compactor before April of 1997, and considered this accident to be the result of the diminished decision making ability he had suffered since the injury by accident of November 29, 1996.
12. As a result of the accident of April 2, 1997, plaintiff was treated and released with a couple stitches on the other side of his head, opposite from the injury site of November, 1996. Plaintiff has not worked since April 2, 1997.
13. On June 11, 1997, plaintiff returned to Dr. Sharma. Plaintiff denied any problems with his diabetes or blood pressure, but complained of problems with his memory. Dr. Sharma recommended that plaintiff undergo a neurological examination.
14. On November 19, 1997, plaintiff suffered a fractured leg, while cutting wood at home. Plaintiff believed this injury was again the result of poor judgment, and that it would not have occurred prior to his head injury of November 1996.
15. Plaintiff's personality, memory and cognitive problems continued to worsen and plaintiff returned to Dr. Livingston on January 13, 1998. According to Dr. Livingston, since plaintiff had no acute lesion and no worsening of his CT scan, but was still experiencing memory loss, plaintiff's memory problem might be permanent in nature. She also stated that plaintiff had lacunar infarcts found in the right basal ganglia of plaintiff's brain that would have been present prior to the injury of November 1996. However, this area of the brain does not control memory, higher cognitive functions, the ability to play musical instruments, urination, or sexual functions. The right basal ganglia only controls left-sided motor functions and coordination. Dr. Livingston ultimately deferred to a neuropsychologist's input as to the nature of plaintiff's memory and cognitive problems.
16. On March 25, 1998, defendant-carrier referred plaintiff to Dr. Thomas Gualtieri for a neuropsychiatric evaluation. According to Dr. Gualtieri, plaintiff described several severe problems that might be related to head injury, including memory problems, concentration, word finding, getting things done, forgetting things that happened when he was young, and feeling confused and disoriented. Plaintiff also described numerous "moderate problems" including headache, neck pain, insomnia, fatigue, low energy, lack of initiative, problems remembering what he has read, short attention span, distractability, letter and number reversals, difficulty making decisions, blurred vision, drowsiness, angry outbursts, irritability, impatience, restlessness, feeling dizzy, diplopia, decreased sexuality, poor coordination and poor balance.
17. Dr. Gualtieri performed complete physical and neurological examinations and offered an opinion that plaintiff's examination was consistent with many of the complaints made, and that it was possible that plaintiff had sustained a closed head injury as a result of the injury by accident of November 29, 1996, thereby resulting in transient urinary incontinence, long standing neurocognitive problems and behavior changes. Based on the history given by plaintiff and a review of the medical records, Dr. Gualtieri stated that plaintiff suffered a traumatic brain injury on November 29, 1996, as evidenced by the hematoma, plaintiff's loss of consciousness, and the stellate scalp laceration.
18. Dr. Gualtieri also believed that plaintiff's pre-existing small vessel disease made him more susceptible to a greater injury with a more lasting effect. In order to assist in establishing the true nature of plaintiff's disability, Dr. Gualtieri recommended a complete battery of neuropsychological tests. Based on the results of these tests, Dr. Gualtieri stated that the traumatic brain injury of November 29, 1996, is more likely the cause of plaintiff's disability than a diffuse pathology like small vessel disease and that plaintiff's disability could compromise his ability to return to work.
19. On March 25, 1998, plaintiff was referred by the Social Security Administration for a neuropsychological examination performed Dr. William A. Favret. Dr. Favret performed a battery of psychological examinations, as recommended by Dr. Gualtieri, and determined that plaintiff's pattern of performance has been found in individuals with lesions predominantly in the right hemisphere, which is where plaintiff's November 29, 1996, hematoma occurred. Dr. Favret concluded that plaintiff suffered a severe head injury on November 29, 1996 and that plaintiff's memory is probably impaired.
20. On June 8, 1998, plaintiff was referred by his attorney to Dr. Stephen Kramer, an Associate Professor of Psychiatry at the Bowman Gray School of Medicine, and the Director of the Wake Forest University Department of Neuropsychiatry. Dr. Kramer examined plaintiff and concluded that plaintiff's condition is consistent with persistent post-concussive syndrome resulting from either the injury by accident of November 29, 1996 or a combination of the injuries by accident of November 29, 1996 and April 2, 1997.
21. According to Dr. Kramer, the lacunar infarct that was evident on the scans taken on the date of injury of November 29, 1996, were most likely asymptomatic or "silent". Dr. Kramer believed that plaintiff was probably suffering from small vessel disease that would have made him more susceptible to suffering a greater injury from any trauma to the brain. Dr. Kramer testified that the traumatic brain injury that plaintiff suffered on November 29, 1996 precipitated the cognitive problems, the personality changes, and the memory problems of which plaintiff has complained since the injury.
22. On cross-examination, Dr. Kramer disagreed with Dr. Livingston that the cause of plaintiff's deficits was small vessel disease for two reasons: first of all, due to the immediate onset of plaintiff's symptoms after the traumatic brain injury of November 29, 1996; and secondly, because the result of the IQ tests, which showed some improvement over time, is indicative of post-concussion syndrome, as opposed to small vessel disease.
23. Dr. Kramer also disagreed with Dr. Livingston's returning plaintiff to work in March of 1997. Dr. Kramer believed that plaintiff may have been just as incapacitated when he returned to work on March 3, 1997 as he was on April 2, 1997. In Dr. Kramer's opinion, Dr. Livingston had not conducted the proper testing required to check plaintiff's functionality regarding the cognitive deficits from a traumatic brain injury.
24. Dr. Kramer consulted with Dr. Burdette, a neuroradiologist at Bowman Gray School of Medicine. Dr. Burdette reviewed both the CT scan of December 10, 1996 and the subsequent Gadolinium enhanced MRI scan of November 9, 1998. Dr. Burdette agreed with Dr. Kramer that the finding which Dr. Livingston had interpreted as a pre-existing lacunar infarcation in the right basal ganglia was in reality a perivascular space, which is normal and benign. Dr. Burdette also agreed with Dr. Kramer that plaintiff's disability was not caused by his small vessel disease. Dr. Burdette further testified that the technology does not exist to image traumatic brain injuries and stated "the fact that I do not see a gross abnormality, a subdural hematoma, or something like that, does not exclude a traumatic post-concussive type episode."
25. On December 15, 1998, January 18, 1999, and August 19, 1999, plaintiff was examined at the request of defendants by Alexander A. Manning, Ph.D, an expert in neuropsychology, specializing in the study of how the brain functions and the relationship of brain functions to behavior. On December 15, 1998, and August 19, 1999, Dr. Manning performed a complete battery of neuropsychological tests and concluded that considering plaintiff's deficits in his right cerebral hemisphere, which is where his injury occurred in November 1996, some residual effects of that head injury may be superimposed on plaintiff's pre-existing brain pathology. Dr. Manning also concluded that it seemed unlikely that plaintiff will be able to return to gainful employment.
26. Dr. Manning explained that due to plaintiff's age, his brain would take longer to recuperate from a traumatic brain injury. Dr. Manning testified that the presence of the diffuse small vessel disease made plaintiff more susceptible to injury and that the disease made it more difficult for plaintiff to recover, as also indicated by Drs. Gualtieri and Kramer.
27. At the request of defendants and after agreement by plaintiff, plaintiff returned to Dr. Manning on August 19, 1999, to complete the MMPI-2 Psychological Test. Based on this test, Dr. Manning concluded that there is no indication of malingering by plaintiff and that plaintiff suffers from an impairment of the brain. Additionally, Dr. Manning testified that, as of the time he first saw plaintiff on December 15, 1998, plaintiff was not capable of returning to work. Furthermore, Dr. Manning testified that the traumatic brain injury of November 29, 1996, either aggravated or accelerated the diffuse disease process, causing plaintiff's disability, and that there was no way for him to separate the effects of the diffuse disease process from the effects of the traumatic brain injury.
28. The greater weight of the medical evidence establishes that plaintiff's disability after April 2, 1997 was the proximate result of either the injury by accident of November 29, 1996 or a combination of the compensable injuries plaintiff sustained on November 29, 1996 and April 2, 1997. The greater weight of the evidence also establishes that since April 2, 1997, plaintiff has been unable to earn wages in any capacity as a result of either the injury by accident of November 29, 1996 or a combination of the compensable injuries plaintiff sustained on November 29, 1996 and April 2, 1997.
 ***********
Based upon the findings of fact and conclusions of law, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On November 29, 1996 and April 2, 1997, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. N.C.G.S. § 97-2(6).
2. As a direct and proximate result of plaintiff's work-related injuries by accident on either November 29, 1996 or both November 29, 1996 and April 2, 1997, plaintiff sustained an injury to his brain, and requires further medical treatment and supplies. N.C.G.S. § 97-25.
3. Plaintiff has not yet reached maximum medical improvement as a result of his compensable injuries, and has been unable to return to work with defendant-employer or in any other type of work which plaintiff is vocationally suited since April 2, 1997. N.C.G.S. § 97-29.
4. From and after April 2, 1997, plaintiff was and remains incapable, because of injuries sustained in either the injury by accident of November 29, 1996 or both injuries by accident of November 29, 1996 and April 2, 1997, of earning wages which he was receiving at the time of his injuries by accident, at the same or any other employment. N.C.G.S. § 97-29.
5. Plaintiff is entitled to temporary total disability benefits at the rate of $241.69 per week from and after April 2, 1997 and continuing thereafter at the same rate until further Order of the Industrial Commission or until plaintiff returns to work. N.C.G.S. § 97-29.
6. Plaintiff is entitled to payment of all past and future medical expenses, related to his compensable injuries by accident of November 29, 1996 and April 2, 1997, for so long as the medical treatment received is designed to effect a cure, provide relief and/or lessen the period of Plaintiff's disability. N.C.G.S. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. For his temporary total disability compensation, defendants shall pay plaintiff at the rate of $241.69 per week from and after April 2, 1997 and continuing thereafter at the same rate, until further Order of the Industrial Commission or until plaintiff returns to work. Amounts which have accrued shall be paid to plaintiff in a lump sum, subject to a reasonable attorney fee, approved in Paragraph 2.
2. A reasonable attorney fee in the amount of twenty-five percent of the compensation due plaintiff under Paragraph 1 of this AWARD is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of the compensation due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be deducted from the sum due plaintiff and paid directly to plaintiff's counsel.
3. To the extent that the same is reasonably designed to effect a cure, give relief or lessen the period of disability, defendants shall pay all medical expenses incurred by plaintiff as a result of his compensable injuries. Payment shall be made when bills for the same shall have been submitted to the Industrial Commission for approval.
4. Defendants shall bear the costs. Defendants are relieved of the sanctions imposed in Deputy Commissioner Stanback's Order of August 21, 2000 vacated by this Opinion and Award. Defendants shall pay the expert witness fee for the deposition of Dr. Burdette totaling $600.00. As indicated at oral arguments before the Full Commission, plaintiff is responsible for Dr. Burdette's bill of August 1, 2000 for a $300.00 consultation with plaintiff's attorney prior to the deposition. Dr. Burdette's bill of April 25, 2000 shall be handled by the carrier under the Industrial Commission's medical fee schedule.
This the ___ day of October 2001.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/mhb